Whitaker, Judge,
delivered the opinion of the court:
This is a suit for infringement by defendant of plaintiff’s patent No. 2,335,474 on apparatus designed to counteract the flow of blood from the head of the pilot of an airplane, caused by sharp changes in its direction, such as pulling out of a steep dive or a sharp bank.
Defendant says plaintiff’s patent is invalid because anticipated by the prior art, and that, if valid, it has not infringed it. Our Trial Commissioner finds it is anticipated by the prior art, but that if held to be valid, it has been infringed by defendant. We agree with the Commissioner that it was anticipated by the prior art. Since this is dispositive of plaintiff’s action, we do not reach defendant’s second defense.
Simply stated, plaintiff’s alleged invention consists of a garment which snugly fits the entire body below the neck, or a part of the body, in which there are sack compartments of relatively small area coextensive in length with the body or the body member to be covered, which can be filled with fluid when pressure on the body or the body member is desired. The sack compartments are connected to a reservoir containing the fluid with which the sacks are to be filled, when desired. Between the reservoir and the sacks there is a valve which, when opened, permits the fluid to run into the sack compartments. The filling of the sack compartments stretches the garment and pulls it tight around the body member not covered by the sack compartments, and thus restricts the flow of blood into this member.
The Patent Examiner repeatedly rejected plaintiff’s application because anticipated by the Holste patent No. 2,228,115, now Reissue No. 22,101 (original application filed October 6, 1937). This would appear to have had some justification, at least. The only difference between the two patents, which we are able to discern, is that Holste called for sack compartments coextensive with the garment around the body member; whereas Beall called for sack compartments of relatively small area, which, through tension on the garment *498 produced by filling the sack compartments, provided the desired pressure. Plaintiff finally persuaded the Examiner that this was a material improvement, because, first, it provided ventilation, said to have been absent in the Holste patent, and, second, it allowed greater mobility for the pilot than the Holste patent.
The Holste patent did provide for ventilation by means of zippers, which permitted opening the garment at various parts of the body, but, of course, the garment could not be opened when pressure was desired, which was throughout the maneuvers of the airplane. The Holste patent did restrict mobility to a considerably greater extent than plaintiff’s patent. However, it would seem that it would have been obvious to anyone, certainly to one having ordinary skill in the art at the time of the Beall application, that both greater mobility and more ventilation could be obtained by reducing the area covered by the sack compartments, relying upon the tightening of the garment adjacent to other areas of the body, produced by the filling of the sacks, to supply the needed pressure.
Even if this was not obvious, Poppen, whose patent 2,104,758 was prior to plaintiff’s, knew this could be done, because his device called for a fluid-filled sack of an area less than the portion of the body where the pressure was desired. The Poppen device was designed to apply pressure on the abdomen, but the sack compartment did not encircle the entire abdomen. He relied upon the tightening of the abdominal belt, as a result of the filling of the sack, to supply the desired pressure on the front of the abdomen. If this could be done in the case of the abdomen, it could be done, of course, in the case of the other members of the body. The Beall patent does not specify the body member to which the pressure is to be applied, whether to the abdomen, the legs, the torso, the arms, or the entire body, but the principle of the Poppen patent could be applied to any one or more of them. The preferred embodiment of the invention described in the specifications shows coverage of the entire body, as in the Holste patent, but the claims are not so limited, and the claims, not the specifications, determine the extent of the patent grant. At any rate, Poppen showed it was not neces *499 sary that the sack compartments should cover the entire area to which pressure was to be applied. Whether Poppen had ventilation in mind, we do not know, but this is the natural result of what Poppen did.
The two features of the Beall patent emphasized by Beall’s attorney on the final hearing before the Patent Examiner were greater ventilation and more mobility. On account of these features the Examiner allowed the patent. Restriction of the area to be covered by the fluid-filled sacks provided both, and it seems to us obvious that it would, and, further, that the desired pressure could be obtained over the entire area by the tightening of the garment caused by filling the sack compartments. If this was obvious to one skilled in the art at the time of the Beall application, it was not patentable. Title 35, U.S.C. § 103.
Even if not obvious, it had been previously suggested by the Poppen patent.
The foregoing are the main features of plaintiff’s patent which are said to distinguish it from the prior art. Other details are fully covered in the Trial Commissioner’s report, which we approve and adopt, with only minor changes, as the findings of the court. The features of plaintiff’s patent by which plaintiff’s counsel was able to convince the Examiner it was patentable, and its other features, as well, are anticipated by the prior art.
Since we are of opinion plaintiff’s patent is invalid, we do not consider whether its claims read on defendant’s products.
Plaintiff’s petition will be dismissed.
It is so ordered.
Durfee, Judge, Laramore, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a patent suit under the provisions of Title 28, U.S.C., Section 1498. Plaintiff seeks to recover reasonable and entire compensation for unauthorized use and manufacture by or for the United States of equipment described and claimed in United States Letters Patent No. 2,335,474. Said *500 patent issued, to plaintiff on November 30, 1943, and is entitled “Pressure Producing Apparatus.”
2. Plaintiff has been the owner of said patent since issuance. Plaintiff is a citizen of the United States residing in Sumter, South Carolina.
3. On November 2,1959, the parties agreed that the issues of infringement and validity of the Beall patent be first determined upon full proofs, findings of fact, and argument of counsel, and agreed that any accounting issue be deferred until entry of an order by the court sustaining the petition.
4. The subject matter involved pertains to a suit for wear by an aviator for the purpose of applying pressure to his body to counteract the effects of acceleration during aircraft maneuvers. In the rapid maneuvering of aircraft, the resultant centrifugal forces tend to displace or interfere with the natural circulation of body fluids. When the force acts downwardly of the body, it may substantially interfere with circulation of the blood to the head. The centrifugal force or acceleration producing such a condition is conveniently expressed in “G” units, one G being the force of gravity experienced by a body at rest at sea level and at a latitude of 45°. A downwardly acting force is referred to as “positive” and an upwardly acting force as “negative”. The present subject matter is concerned with counteracting “positive” or downwardly acting G forces. The effect of such a force in excessive amount on a body is that the senses of hearing and sight are impaired, leading to sightlessness or blackout, and unconsciousness. Such impairment is often accompanied by significant mental confusion and may persist for a significant period of time following the reduction or removal of said excessive G force.
5. The Beall patent in suit states that the invention relates to apparatus for supplying pressure to different parts or portions of the human body under varying abnormal conditions. An object of the invention is said to be the provision of safety apparatus in the form of personal equipment for aircraft crews for eliminating or minimizing physical impairment which results from forces produced by rapid maneuvering of the aircraft. The patent specification describes such equipment as including a garment constructed and ar *501 ranged to snugly fit body portions and having sack members associated therewith. By means of the sack members, fluid pressure applied within the sack member is directed against the body portions and simultaneously tightens the garment around the body portions. The confining pressure thereby applied opposes the internal pressure within such body portions and tends to prevent the accumulation of body fluids in such portions. The patent specification states that when the aviator pulls out of a dive maneuver, the centrifugal force created by the motion of the aircraft causes internal pressure in the lower parts of the body and tends to withdraw blood from the head. The patent specification continues by stating that at the same time an equal amount of pressure is produced in the sack portions of the garment and produces a corresponding equal pressure which counteracts this flow of blood and thereby prevents blackout.
6. Pressure producing apparatus disclosed by the Beall patent is illustrated in diagrammatic drawings. These patent drawings are reproduced at the end of this report. Bef erring to said drawings, fig. 1 is a diagrammatic view in elevation and partly in section showing a body garment 10 enclosing a fluid-tight sack 13 which extends along the back, seat, and rear leg area. As shown in fig. 2, the sack in the rear portion of the garment 10 includes arm portions 40, a back portion 41, and leg portions 42 interconnecting and adapted to be filled with water. The construction shown in fig. 2 includes a connection 18 between the sack 41 and the interior of helmet 17. The modified construction shown in fig. 4 provides an air sack 44 superimposed on or surrounding a water sack 46 at the back of the aviator’s garment. Figs. 5, 7, 8, and 9 disclose inflatable collar constructions for sealing the aviator’s pressurized helmet 17 to his neck.
i7. Portions of the apparatus disclosed in the Beall patent drawings are described in the Beall patent specification as follows:
*****
Bef erring to Figs. 1, 2 and 3 of the drawings, there is shown a preferred embodiment of the invention as applied to an aviator’s garment indicated generally by the numeral 10. This garment includes a snugly fitting inner body garment portion 11 and a spaced outer *502 garment portion 12. This outer spaced portion forms a sack or fluid tight compartments 13-13 for sustaining fluid pressure as hereinafter designated. These compartments are preferably in the form of relatively long narrow fluid pressure producing sack members substantially coextensive with the arm, leg and body portions, and are in free communication with one another. Fluid pressure is supplied to these compartments by means of a tank or reservoir indicated by the numeral 14. This tank communicates with the compartments 13-13 by means of a conduit 15 and the flow may be controlled by a valve 16.
While the suit is shown with fluid containing sack portions for transmitting fluid pressure to the body, it is obvious that the suit compartments may be arranged to substantially encircle or enclose the body members. Whichever form is employed it has been discovered that the fabric material of the suit must fit snugly when the pressure is brought into effect. Liquid, such as water, is most desirable because it has substantially the same specific gravity as the blood in the body. Therefore the body is subjected to the same pressure as though it were actually encased in a mobile liquid.
‡ # ❖ * #
The suit is preferably made adjustable to the body size by means of a conveniently disposed lacing indicated by the numeral 28. The suit is further provided with quick opening devices such as a “zipper” fastener indicated by the numeral 29. The relative position of these parts is better shown in Fig. 6.
This arrangement provides a comfortable and form fitting garment which may conveniently be adjusted to the body of different sizes of persons and may be quickly and readily put on or removed.
The suit also contains a fluid containing compartment in the form of a quilted seat indicated by the numeral 30. The cells of this seat portion are in free pressure communication with the remainder of the suit compartments as well as the tank pressure source 14.
To further provide for the desired efficient operation of the device, the tank 14 may be filled with just sufficient fluid to fill the suit compartments 13-13, and the application of fluid pressure may be controlled in the following manner.
When it is desired to create pressure within the suit compartments, fluid is admitted by the valve 16 so that the fluid shall reach a desired predetermined height in the suit. By leaving valve 16 open, the volume of liquid *503 within the suit will be compensated for by the return flow to the reservoir 14. In other words, the act of breathing causes the liquid to rise and fall.
* # * * *
Referring particularly to the suit shown in Fig. 3, when the aviator desires to go into a power dive he opens valve 16 which permits the body sacks 40, 41 and 42 to fill with liquid and thereby exert a pressure equal to the vertical column of water from any point in the sacks up to the water level in tank 14. When the aviator pulls out of this dive, the centrifugal force created by the motion of the plane causes internal pressure in the lower parts of his body and tends to withdraw the blood from the head. At the same time, an equal amount of centrifugal force and pressure is created in the sack portions 13-13 of the suit and produces a corresponding and equal pressure which counteracts this flow of blood and thereby prevents blackout.
One important advantage of the arrangement of the long narrow fluid containing pressure producing sack members in relatively small contact area with the body members of the person wearing the suit is that it facilitates ventilation through the garment fabric and the removal of body perspiration in all parts of the garment except those in actual contact by the sack members. This is of primary importance in producing a garment or suit of this character which may be worn with reasonable comfort, as well as permitting mobility of the aviator in the normal discharge of his duties. In other words, ample provision must be made for ventilating the smt to remove perspiration and prevent smothering of the person while enclosed in a garment of this character and for retaining the blood under pressure effects so as to effectively prevent the “black out” condition.
It will be obvious that the body sack 41 may be supplied with air or gas pressure by communication with the helmet portion and if it is desired to go into a power dive, this same sack 41 may be filled with liquid to counteract the pressure caused by centrifugal force.
The suit arrangement illustrated in Fig. 4 does not effectually prevent black-out but does provide an efficient support for the front portion of the body as well as facilitating a breathing and respiration.
s{e * * # *
Having thus described the several embodiments of my invention, the operation thereof may be restated as follows: The garment contains or includes fluid pressure *504 sack members or compartments, 13-13, constructed and arranged to apply external pressure on any desired parts or portions of the aviator’s body. These sack members may be filled with gas or liquid to create the desired pressure.
This pressure may be by these means either separately or in combination but it is preferable to use water or other similar liquid having approximately the same specific gravity as the human body. It will be noted that if a compartment is filled with water, a pressure will be created within the sack which will be proportional to the depth of the liquid, and when the liquid has a height corresponding to the height of the body, a pressure will be created equal to the gravitation component of the pressure of the blood within the body. If this sack or compartment member is constrained by reason of the garment, it will create a pressure entirely around the body member equal to the pressure in the sack at this point and will operate in the same manner as though the liquid containing member completely surrounded the body .
Whichever position the aviator may assume, the sack will assume a corresponding position as it is in pressure contact with his body, and the vertical height of the water column within the suit will be approximately the same as the gravitational component of the blood pressure within his body.
When the aviator so maneuvers as to create acceleration due to centrifugal force or by other means, changes in pressure are produced within the suit which will correspond to those changes of pressure which are produced within the aviator’s body, and they will neutralize each other. If the aviator does not desire to go into any maneuver which will create acceleration but desires to apply an oxygen supply to the helmet portion of this suit, the same pressure which is in the helmet is also applied to all portions of the aviator’s body so as to eliminate muscular effort in expelling the air from the lungs as well as constricting the circulation in other portions of his body.
While in this condition, if the aviator desires to make a dive or other maneuver which would create acceleration, he can then fill the sack with water up to his shoulders and this will create an additional pressure owing to the combined pressures of the oxygen in the helmet and gravitational pull upon the column of liquid. As heretofore pointed out, the suit may be constructed *505 so as to provide separate sacks for liquid and air, or to use one sack for both purposes, and I do not wish, to be limited to the use of any particular construction.
8. The Beall patent claims alleged to be infringed are reproduced below with indentations and emphasis added to facilitate identity and understanding of the structures sought to be covered by the patent.

Patent Olaim, 1

In a body garment having
an inner lining portion adapted to snugly fit and conform to the contour of a body member,
a fluid containing sack compartment of relatively small contact area formed integral with said inner lining and substantially coextensive in length with said body member so as to exert a constant fluid pressure on a portion of said body from top to bottom thereof, and
connection means for supplying fluid pressure to said compartment from a fluid source apart from the garment.

Patent Olaim %

Apparatus of the character designated in claim 1 in which
a reservoir supplies fluid pressure to the sacks, and means for releasing the fluid from the sacks, and returning the same to said reservoir.

Patent Olaim 3

Apparatus of the character designated in claim 1 including
a fluid reservoir,
valve means for regulating the flow of fluid to the sacks,
valve means for releasing the fluid from the sacks, and
means for coordinating the operation of the valves.

Patent Olaim Jf.

As an article of manufacture,
a suit of substantially non-elastic material snugly fitting the body,
*506 a relatively narrow pressure producing element located inside said suit and in relatively small area pressure contact relation with the body from top to bottom thereof.

Patent Claim 5

As an article of manufacture,
a suit of substantially non-elastic material snugly fitting the body,
a relatively narrow pressure producing element located inside said suit and in relatively small area pressure contact relation with the body from top to bottom thereof,
means for admitting paid to said pressure producing element, and
means for relieving the pressure in said element.

Patent Claim 6

As an article of manufacture,
a suit of substantially non-elastic material snugly fitting the body,
a relatively narrow pressure producing element located inside said suit and in pressure contact relation with the body from top to bottom thereof,
a reservoir including tubular connection means for conducting fluid to and from said pressure producing element,
means for adjusting the size of the suit independently of the pressure producing element to different sizes of body, and
quick opening closure means for retaining the suit in close proximity to the body to obtain the desired pressure benefits from the pressure producing element.

Patent Claim 7

in a suit,
a snug body fitting garment, said garment including
relatively narrow fluid tight pressure producing sack members extending longitudinally of the garment, and a fluid in said sack members
whereby uniform circumferential tension shall be produced in the fabric of the snug fitting garment to produce pressure on the body of the wearer.

*507
Patent Claim 8

In a suit,
a snug fitting outer body garment, said garment including
relatively narrow longitudinally extending fluid tight pressure producing sack members, a fluid in said sack members,
the confined fluid producing pressure on the body enclosed by the garment fabric
whereby that portion of the enclosed body not covered by the sack members shall be naturally ventilated.
9. Claim 1 of the Beall patent is readable upon the equipment disclosed in fig. 1 of the patent drawings as follows. Garment 10 has a lining portion 11 adapted to fit a body member, a sack compartment 13 integral with the lining 11, and a connection 15 for supplying fluid pressure. Claim 2 adds the reservoir 14 and the release and return means including release valve 31 and return conduits 32, 34 and 35. Claim 3 adds the inlet valve 16, the outlet valve 31, and valve coordinating means 36. Claim 4 recites a suit 10 of nonelastic material and narrow pressure producing elements 40, 41 and 42 inside the suit as illustrated in figs. 2, 3, and 6 of the patent drawings. Claim 5 adds the fluid admitting means 16 and the pressure relieving means 43 as illustrated in fig. 3. Claim 6 adds the reservoir 14, the tubular connection means 15, suit size ad justing means including lacing 28 and quick opening closure means including zipper 29, as illustrated in figs. 3 and 6. Claim 7 recites the garment 10, the pressure producing sack members 40, 41, and 42, and fluid in the sack members. Claim 8 is similar to claim 7 but adds that the body is naturally ventilated where not covered by sack members 40, 41, and 42. The Beall patent specification quoted in part in finding 7 teaches that the fluid containing sack portions may be arranged to substantially encircle or enclose the body members; that liquid, such as water, is most desirable; that the body sack 41 may be supplied with air or gas pressure by communication with the helmet, and that the modified construction illustrated in fig. 4 does not effectually prevent blackout.
*508 VALIDITY
10. Defendant has contended that tbe Beall patent claims are invalid for anticipation by and lack of invention over tbe following patents and publications having effective dates prior to tbe filing date, September 18, 1940, of tbe Beall patent in suit. Tbe earliest date to which plaintiff is entitled for bis alleged invention is said filing date.

Prior Patents

Poppen_ 2,104, 758 Jan. 11, 1938
Fist_ 1,433, 679 Oct. 31, 1922
Charnaux_ 1,729,502 Sept. 24, 1929
Brathwaite- 1,970,042 Aug. 14, 1934
Hill & Barnard_ 598, 343 Feb. 1, 1898
Lake_ 1, 629,108 May 17, 1927
Rosett - 1,608, 239 Nov. 23, 1926
Holste_Re. 22,101 (original application filed October 6,1937) May 26, 1942
Blumer (British)_ 248,356 Sept. 9, 1926

Prior Publications

Physiological Limitations of Flying (Flight magazine pages 99-100). Feb. 2, 1933
Blood-Pressure in Surgery (by George Crile, pages 288-291). 1903
Compendium of Aviation Medicine (page 97 of translation from Grundrib der Luftfahrtmedi-zin). 1939
Akron Times-Press (clipping of article on Wiley Post flying suit). Feb. 22, 1935
Aircraft Engineering (page 164 of article entitled Physiology and the Pilot). June 1940
11. Poppen patent 2,104,758 discloses an abdominal belt for controlling intra-abdominal pressures to avoid the physiological effects of high acceleration encountered in aircraft maneuvers. The Poppen patent drawings are reproduced at the end of this report. The Poppen patent specification discloses that the belt 11 is made of a pliable inelastic material of such length as to pass completely around the body and to provide a suitable overlapping of the ends to insure snugness of fit, and of such width 'as to adequately cover the entire body abdominal area. The frontal area of the belt is transversely enlarged to conform to the contour of the lower *509 abdomen, as indicated by the numeral 14. Longitudinally attached to the outside of the belt 11 are straps 15 provided with buckles 16 for securing the belt in position around the body. The perineal straps 12 are attached to the belt 11 downwardly across the frontal area. The depending ends of the straps are of such length as to pass snugly under and between the legs and to properly engage the fastening buckles 17 secured at the back near the lower edges of the ends of the belt 11 when the latter is in position about the body. The perineal straps 12 are so attached that they keep the frontal portion of the belt 14 closely pressed against the lower abdomen. The elastic bag 13 is attached to the inner side of the belt 11. It consists of an airtight rubber bladder expansible when inflated. Constant pressure within the elastic bag 13 is maintained from a gaseous source of supply such as an air flask connected to the bag by a quick release fitting and valve assembly. The Poppen patent specification also discloses that when the aircraft maneuver is such as to subject the occupant of the aircraft to an acceleration downward along the axis of his body, as would be the case in dive bombing, a reduction in the amount and pressure in the upper part of the body results, which causes physiological symptoms due to a reduction of the flow of blood through the brain and a reduction of the blood supply to the heart which further reduces circulation above the heart. The Poppen specification further discloses that increasing the intra-abdominal pressure by inflating the belt 11 reduces the hydrostatic accumulation in that part of the body and will result in redistribution of the blood so that the supply to the heart will not be reduced below the normal amount, and thus prevent the pooling of blood in the abdomen. The Poppen patent was not cited nor used as a basis for rejecting the Beall patent application by the Patent Office examiner.
12. Claim 1 of tire Beall patent is anticipated by the disclosure of Poppen patent 2,104,758. Applying the terminology of Beall claim 1 to the Poppen construction, “a body garment having an inner lining portion adapted to snugly fit and conform to the contour of a body member” is met by the Poppen abdomen-engaging belt 11, the inner face of which constitutes an inner lining which snugly fits and con *510 forms to the contours of the abdomen. The Beall claim recital of “a fluid containing sack compartment of relatively small contact area formed integral with said inner lining” is met by the Poppen elastic bag 13 attached to the inner side of the belt 11. The Beall patent specification describes the compartments as preferably in the form of long narrow fluid pressure producing sack members substantially coextensive with arm, leg and body portions, and also specifies that the suit compartments may be arranged to substantially encircle or enclose body members. The Poppen bag 13 is of smaller contact area than the belt 11 as disclosed by dotted lines in fig. 2 of the Poppen patent drawings, and is described as having its front wall 18 cemented to the back of the front wall 19 of belt 11 as illustrated in fig. 4 of the Poppen patent drawings. The Beall claim recital that the sack compartment is “substantially coextensive in length with said body member so as to exert a constant fluid pressure on a portion of said body from top to bottom thereof” is met by the shape of the Poppen elastic bag 13 which applies a constant fluid pressure to both the upper abdomen and the lower abdomen. The Beall claim recital of “connection means for supplying fluid pressure to said compartment from a fluid source apart from the garment” is met by the Poppen tube 24 for connection to a source of air supply which the Poppen patent specification discloses may be a pump or flask. Beall patent claim 1 is invalid in view of Poppen patent 2,104,758.
13. On February 2, 1933, Flight magazine contained an article entitled “The Physiological Limitations of Flying,” reporting a lecture by a Royal Air Force officer. This article suggests equipment to prevent blackout. The first construction includes a pivoted air scoop normally held out of the aircraft slipstream by a spring and being movable into the slipstream by a weight subjected to acceleration forces. Air pressure from the projecting scoop was to be conducted to an inflatable corset around the aviator’s abdomen for sup-poi*ting him until such time as the acceleration forces were relieved. The second suggestion includes placing the aviator’s seat on a slide to operate a hydraulic ram to pressurize the corset or placing the aviator on an air-cushion seat to pressurize the corset. There is no evidence that any of the *511 suggested devices was ever built or successfully used. The inflatable abdominal corset suggested by this publication is illustrated therein as including a series of narrow vertically extending compartments connected by body-encircling tubes at the top and bottom edges of the corset. One modification includes a connection tube between the corset,and a fluid pressure source in the form of an air cushion upon which the aviator is seated. The abdominal inflatable corset disclosed in this publication is generally similar to the Poppen patent abdominal belt.
14. Fisk patent 1,433,679 discloses a combination blood pressure and respiration instrument including an arm band having a pressure applying bag and including valved connections and devices for pressurizing the band and indicating blood pressures. Such sphygmomanometers are not effective garments for preventing blackouts due to aircraft flight conditions.
15. Chamaux patent 1,729,502 discloses elastic medical belts, corsets and bandages made from perforated rubberized fabrics or sheets. One form of abdominal support corset disclosed by this Chamaux patent includes inflatable pneumatic compartments. The Charnaux patent specification clearly teaches that the use of perforations in body confining devices allows for aeration and evaporation. The Chamaux patent does not mention garments for preventing blackouts due to aircraft flight conditions.
16. Brathwaite patent 1,970,042 discloses an arm band for use with sphygmomanometers. The band is made of inelastic material provided with a compartment for containing an inflatable rubber sack. The band is provided with a series of hookless slide fastener devices permitting easy and quick application to and removal from a patient’s arm. This Brathwaite patent does not mention garments for preventing blackouts due to aircraft flight conditions.
17. Hill and Barnard patent 598,343 discloses another form of sphygmomanometer provided with a spring clasp lined with an inflatable air bag and shaped to partially or entirely surround the patient’s arm. This disclosure does not mention blackout prevention.
*512 18. Labe patent 1,629,108 relates to apparatus for the treatment of varicose veins. The apparatus includes fluid tight rubberized fabric casings for enclosing a limb or portions thereof. Compressed air, gases, or liquids applied within the casing are utilized to pressurize or treat the affected limb. The Lake patent does not mention blackout prevention.
19. Eosett patent 1,608,239 discloses a therapeutic device including a multiplicity of inflatable tubes encircling the trunk and limbs of the patient. Fig. 1 of the Eosett patent is reproduced at the end of this report. The device includes a distributing valve for applying air pressure to the various tubes successively to produce a systematic kneading action said to propel venous blood toward the heart. The Eosett pneumatic garment is intended to exert waves of pressure from the patient’s extremities toward his heart region. This Eosett patent makes no mention of blackout prevention.
20. Holste reissue patent 22,101 is based on Holste patent 2,228,115, original application filed October 6, 1937. The original Holste patent was cited against the Beall application for patent by the Patent Office examiner. The disclosure of the Holste reissue patent is generally similar to that of the original Holste patent. The Holste reissue patent discloses a liquid-jacketed aviator’s garment. Fig. 1 of the reissue patent drawings is reproduced at the end of this report. The Holste garment is for the purpose of reducing or eliminating the adverse effects produced by rapid changes of speed and direction during aircraft maneuvers. The Holste reissue patent specification states in part—
As a preferred apparatus for carrying out the method, I provide an aviator’s garment having in addition to the main or torso portion, body and leg portions and usually also arm portions; and the garment is made up of flexible inner and outer wall forming shells spaced to form attenuated or thin chambers that contain water or other liquid that is free for circulation therein.
*****
Broadly stated the method of the present invention consists in confining a portion of the human body, and preferably a major portion of the body, inclusive of legs and torso, within an inelastic garment and providing within this garment a liquid containing chamber *513 adapted to be expanded by the introduction of liquid therein to thereby exert a confining pressure entirely around a substantial portion of the human body. The construction is such that it will exert a confining pressure about and against the exterior of the body, which will be greatest on those portions of the body wherein blood pressure is greatest. In such an arrangement, the tendency of the blood within the body to rush away from one end of the body and to the other end thereof under changing direction or speed of motion will be greatly counteracted by increased external pressure to those portions of the body wherein internal blood pressure is increased.
¡Jí *í*
* * * This garment is formed with the body or torso portion, with leg and feet portions and with arms; and all of these portions are formed by outer and inner wall forming shells 8 and 9 both of which are flexible. The inner shell 9 is collapsible and may be of elastic material, but the outer shell should be quite inelastic, although very flexible. The breast or body portion of the garment in the front is slit at 10 as shown in Fig. 3, the adjoining edges of the slit being liquid tight but having fasteners 11 which are preferably of the well-known zipper type. The leg portions of the garment in front are likewise slit or formed with longitudinal openings shown in Fig. 3 and are provided with fasteners suchas zippers 12. Also the lower portions of the arms of the garment are likewise slit and provided with fasteners such as zippers 13.
The Holste reissue patent specification states that the liquid used may be water and that the arms of the garment or portions thereof may be omitted.
21. Following the rejection of Beall patent application claims by the Patent Office examiner as fully met in the original Holste patent, counsel for Beall argued as follows:
In reply to the Examiner’s rejection of claims 1 to 4 on the patent to Holste, this is believed to be untenable because the opening and closing of the valves indicated by numerals 8a produce no result whatever outside of providing a means for filling the suit as stated on page 2, column 1, lines 16 to 21. Holste provides no means whatever to drain the suit nor does he suggest any means or advantageous results which might result from such draining or replenishing the suit as suggested by applicant to meet the required demands. When applicant *514 operates valves 43-43 to vent the suit, it is for the purpose of relieving pressure during normal low altitude flying conditions and when the pumping apparatus, including elements 31, 32, 33, 34 and 35 and the supply source 14 are operated, the suit is refilled to accomplish novel and practical results not suggested by Holste or even possible to accomplish by the Holste structure.
Claims 1 to 5 include the limitation that the pressure compartments contact a portion of the body from top to bottom. This is a fundamental distinction over the structure shown in Holste because of the very nature of the body enclosing garment wherein some means must be provided to apply the pressure so that a person would not suffocate or smother when subjected to the normal pressures encountered in high altitude flying. However claims 1, 2 and 3 have been amended to more clearly define the invention by specifying the valve means for effecting the desired controls and thereby clearly distinguish over the Holste patent.
After a repeated rejection of patent application claims as fully met in Holste, counsel for Beall then argued as follows :
* * * As heretofore pointed out the Holste structure provides for the pressure producing sacks to completely enclose the body and applicant has performed numerous experiments with suits of this kind and it is clearly shown that a person when enclosed in the Holste suit would smother due to the lack of ventilation. Furthermore, when the Holste garment is filled with water the weight becomes excessive and the suit rigid and thereby prevents mobility of the person in the natural use of his arms and legs in particular. This immobility is due to the fact of the rigidity of the suit when subjected to pressure and it is essential that some means be provided to eliminate this disadvantage. Applicant has solved the problem by the small area fluid pressure sacks which extend from the top of the curtain to the bottom thereof. The contact pressure exerted by the sacks covers a small area but the advantageous results are due to this fundamental feature. The pressure is exerted directly on the body and the fabric enclosing the body. In other words, the circumferential pressure is exerted and the longitudinal pressure due to the static head of the fluid is reduced to a minimum. It is this static head of the fluid in a suit of the Holste type that causes rigidity of the suit and the resulting immobility of the person.
*515 22. The application file of the Beall patent in suit does not indicate that consideration was given to the Holste patent teaching that in the Holste garment the liquid compartments on the torso, leg and arms portions of the body are divided by longitudinally-extending slits or longitudinal openings closed by quick-opening closure means. Similarly, the file does not indicate that consideration was given to the Holste teaching that in some instances the arms or portions thereof might be omitted in the Holste garment.
23. Claim 1 of the Beall patent is anticipated by the disclosure of Holste reissue patent 22,101. Applying the terminology of Beall claim 1 to the Holste disclosure, “a body garment having an inner lining portion adapted to snugly fit and conform to the contour of a body member” is met by the Holste torso-engaging garment having an inner shell portion 9 of flexible elastic material which conforms to the contours of the torso. The Beall claim recital of “a fluid containing sack compartment of relatively small contact area formed integral with said inner lining” is met by the Holste outer and inner wall forming shells 8 and 9, the inner shell 9 being elastic and flexible, the outer shell 8 being inelastic and flexible. The Beall patent specification describes the compartments as preferably in the form of long narrow fluid pressure producing sack members substantially coextensive with arm, leg and body portions and also specifies that the suit compartments may be arranged to substantially encircle or enclose body members. The Beall claim recital of “relatively small’’ contact area is a matter of degree in view of the Beall teaching that the sack members may be substantially coextensive with body portions and may be arranged to substantially encircle or enclose body members. The Holste patent garment includes sack members slit longitudinally by zipper fastener devices and teaches that the arms or portions thereof might be omitted from the garment. The Beall patent claim recital that the sack compartment is “substantially coextensive in length with said body member so as to exert a constant fluid pressure on a portion of said body from top to bottom thereof” is met by the shape of the Holste garment which applies pressure from the top to the bottom of the leg and from the *516 top to the bottom of the torso. The Beall claim recital of “connection means for supplying fluid pressure to said compartment from a fluid source apart from the garment” is met by the Holste connections including stems 8a provided with caps 8b used for filling the space between the shells 8 and 9 with water and venting the space while filling. Beall patent claim 1 is invalid in view of Holste reissue patent 22,101.
24. Blumer British patent 248,356 discloses a pressurized garment for mountaineers, aeronauts and aircraft passengers to counteract the effects of very rarefied air at high altitudes. The Blumer patent outfit includes an airtight rubber suit enclosing the entire body and head. A hand operated pump and an air reservoir are provided for compressing and storing air at normal breathing pressures for delivery to a mouth and nose mask in the suit. Exhaled air is used to inflate the rubber suit and to apply a certain degree of pressure to the body. The Blumer patent does not mention the prevention of blackout and the Blumer suit is not suitable for such a use. The Blumer British patent was cited by the Patent Office examiner in the Beall application file.
25. The article by Crile discloses a pneumatic rubber suit inflated by means of a bicycle pump to control a patient’s blood pressure and circulation during and following surgery.
26. The German article Grundrib der Luftfahrtmedizin discusses the effects of acceleration on the brain and on blood circulation. It acknowledges that it had been proposed to surround the body up to the neck with a double walled suit to contain a fluid which possesses a specific gravity similar to that of body tissues and fluids.
27. The Akron Press article discloses the rubber flying suit said to have been worn by Wiley Post when he flew the Winnie Mae at high altitudes. The Post suit included an inner rubber garment and a fabric outer garment, the space between being pressurized with air maintained at ground level air pressure by a motor driven pump.
28. The article in Aircraft Engineering mentions blacking out encountered at accelerations greater than 4G and states that various types of belts with or without pneumatic or hydrostatic pressure exerted on the abdomen and thighs have been produced.
*517 29. Claim 2 of tibe Beall patent, as set forth, in finding 8, adds to the wording of claim 1 a recital of a supply reservoir and means for releasing fluid from the sacks to the reservoir. Poppen patent 2,104,758, discussed in finding 12, discloses that sack 13 is inflated through a connection 24 including a control check valve assembly leading to a source such as a pressure flask or pump. Said control valve is a means for releasing fluid pressures in the belt 11. If the pressure fluid is liquid rather than gaseous, it would be obvious to release the liquid for return to a reservoir therefor. Beall patent claim 2 is invalid in view of Poppen patent 2,104,758. Holste reissue patent 22,101, discussed in findings 20 and 23, discloses that fluid such as water y is supplied to spaces between the garment walls 8 and 9 through inlet and outlet stems 8a and 8b. It would have been obvious to connect said stems to a supply tank or reservoir for water. Beall patent claim 2 is also invalid in view of Holste reissue patent 22,101.
30. Claim 3 of the Beall patent, as set forth in finding 8, adds to the wording of claim 1 a recital of fluid reservoir, valve means for controlling the fluid flow to and from the sacks, and valve coordinating means. The inclusion of interconnected valves in both the Poppen patent and the Holste patent disclosures would have been obvious to anyone having ordinary skill in the art at the time the Poppen and Holste constructions were disclosed. The early Bosett patent, discussed in finding 19, discloses a multiple valve for controlling the passage of fluid pressure both to and from pressure sacks. Beall patent claim 3 is invalid in view of Poppen patent 2,104,758 or Holste reissue patent 22,101.
31. Claim 4 of the Beall patent, set forth in finding 8, recites a snug-fitting suit of non-elastic material and a relatively narrow pressure-producing element inside the suit in small area pressure contact relation with the body from top to bottom. Claim 4 calls for a suit instead of a garment, as recited in the preceding claims. The extension of a garment such as the Poppen patent abdominal belt to cover other portions of the body such as thighs, legs, and/or arms, would have been obvious in view of the disclosures of the Holste or Blumer or Bosett patents, or the disclosures of the Wiley Post suit or the Crile suit. The blackout preventing *518 belt disclosed in the Flight article is illustrated as including a plurality of relatively narrow pressure-producing elements extending from top to bottom of a pilot’s abdomen. Claim 4 is invalid over the Holste reissue patent in view of the Flight article.
32. Claim 5 of the Beall patent, set forth in finding 8, is similar to claim 4 but adds a recital of fluid admitting means and pressure relieving means. Pressurized suits include connections for the inflow and outflow of fluids such as water or air. The Holste patent garment includes connections 8a. The abdominal belt illustrated in the Flight article includes a pressurizing connection at the bottom of the belt B. Claim 5 is invalid over the Holste reissue patent in view of the Flight article.
33. Claim 6 of the Beall patent, set forth in finding 8, is similar to claim 4 but adds a recital of a fluid reservoir, connection means, suit-size adjusting means, and quick-opening closure means. The Holste aviator’s garment is supplied with water y through connection means 82 which obviously must flow from a fluid reservoir not illustrated. The Holste patent discloses quick-opening closure means in the form of zipper fasteners 11,12, and 13. It would have been obvious to provide the Holste patent suit with size adjusting means to enable it to fit aviators of different body sizes. The Pop-pen patent abdominal garment to prevent blackout is adjustable in size by means of straps 15 and buckles 16. Claim 6 is invalid over the Holste reissue patent in view of the Poppen patent.
34. Claim 1 of the Beall patent, set forth in finding 8, recites the subcombination of a garment including sack members with fluid in the sack members. The disclosure of the Poppen patent provides such a subcombination. Air pressure in the Poppen elastic bag 13 produces uniform circumferential tension in the Poppen fabric belt 11. It would have been obvious to substitute narrow bags extending longitudinally of the belt for the single bag 13 of Poppen, in view of the illustration in the Flight article. Claim 1 is invalid over the Poppen patent in view of the Flight article.
35. Claim 8 of the Beall patent, set forth in finding 8, is similar to claim 1 but adds that the portion of the body not *519 covered by the sack members is “naturally ventilated”. The Poppen patent garment provides for ventilation of the body through the belt fabric where it is not covered by the elastic bag 18. Claim 8 is invalid over the Poppen patent.
36. The Beall patent here in suit specifically equates the fully enclosing blackout preventing suit with the one illustrated in the patent drawings where the pressure area has been reduced or narrowed to the longitudinally-extending sections of the back. The latter is no invention over the former or over the prior art patents showing a full-embracing suit construction, such as disclosed in the Holste patents, the Blumer patent, the Wiley Post suit, the Crile suit, or in the Rosett patent.
37. Defendant has urged that the Beall patent claims are invalid in view of prior knowledge and use of blackout preventing equipment in this country. Defendant’s expert, John R. Poppen, retired Captain in the Medical Corps, U.S. Navy, was issued Poppen patent 2,104,758 on January 11, 1938, based upon his application for patent filed in the United States Patent Office on March 12,1936. This patent has been mentioned in preceding findings. Dr. Poppen began his research work relative to the problems of blackout and means for preventing blackout as early as 1932. Research contracts, reports, and correspondence on the subject were generally classified confidential until late in World War II. An expansible vest or jacket construction containing an inflatable bladder was successfully used by Dr. Poppen and others prior to August 30, 1935. The Poppen patent mentioned discloses the belt Dr. Poppen developed and tested prior to that date. In 1939 Dr. Poppen was assigned to the U.S. Navy Bureau of Aeronautics to be in charge of the Medical Research Division. Subsequent developmental work, in which the Spencer Corset Company, Inc., New Haven, Connecticut, cooperated with Dr. Poppen, resulted in pressurized belt and legging constructions experimentally flight tested during August and September 1941. There is no satisfactory evidence to warrant a finding that these particular belt and pressurized legging constructions were known and used prior to the September 18, 1940 filing date of the Beall patent in suit.
*520 38. Blackout prevention belts of tbe Poppen patent type were tested in flight and on an accelerator by the War Department Air Corps at Wright Field, Dayton, Ohio, prior to December 1, 1937. The construction tested was a substantial duplicate of the belt disclosed in the Poppen patent.
39. Defendant’s expert, Wilbur E. Franks, consultant in aviation medicine to the Eoyal Canadian Air Force and a professor at the University of Toronto, Department of Medical Eesearch, became acquainted with the problems of blackout about 1938. Prior to September 1939, Dr. Franks supervised experiments on laboratory animals subjected to Gr forces in a centrifuge. In a classified progress report dated March 1940, Dr. Franks discussed the theoretical principles involved in preventing blackout in flying personnel. The report, defendant’s exhibit 19, states in part:
* * * and the design of a suit is being worked out. A first attempt at the outer suiting has been completed. * * * At present methods of fabricating the rubber lining are under investigation.
* sje * % *
* * * In the meantime an experimental suit will be completed and ready for test in the immediate future. Certain problems arise as mentioned below which can be investigated satisfactorily with acceleration forces now obtainable in flight. * * *
*****
* * * it may prove necessary to protect flying personnel only up to the level of the heart. This matter can be settled by flight experiments. * * * All these problems are to be attacked by flight in co-operation with the E.C.A.F. * * *
In a classified memorandum dated May 14,1940, Dr. Franks commented upon tests made in flight with experimental suit designed to counteract blackout effects of positive accelerations, and wrote in part:
*****
(4) In two tests, one where +6.2 and a second where 7.7 Gr were developed, the onset of symptoms of “blackout” was experienced by the unprotected pilot who in both cases was Flight Lieutenant Beer. No such symptoms were experienced by Lt. Franks wearing the protective suit. * * *
*521 The following recommendations are respectfully submitted:
(1) The experiments carried out in flight should be extended. To accomplish this an aircraft with greater power than the Fleet will be required to develop more sustained positive accelerations of high magnitude.
sH sji # %
Said flight tests above reported were flown in Canada.
40. Experimental and development work in Canada with Dr. Franks’ flying suits extended over many months. Several different suits were under consideration and a number of modified constructions were made. Some suits included water containing compartments and others included entrapped air. A suit having a fluid containing lining made to cover a part of the body and having a zipper type closure means in front was flight tested in Canada by Wing Commander Greig in early June 1940. This suit included three units, i.e., a body section and two leg sections. The sections were adjustable in size and interconnected by lacings, as illustrated in defendant’s exhibits 21, 22, and 23. The development work in Canada progressed to suits D and E illustrated in defendant’s exhibit 25, dated February 18,1941, 5 months after the filing date of the Beall patent application. Defendant’s exhibit 18 is a photograph taken at the end of the war, illustrating six stages in the development of the Franks’ flying suit before it was used in war operations.
41. An interchange of scientific information relative to blackout research took place during 1940 and 1941 between accredited service personnel of the United States and Dr. Franks and his staff in Canada. Defendant’s witness, Otis O. Benson, U.S. Army Air Force flight surgeon, was sent to the Mayo Clinic in 1939 to study aviation problems. Dr. Benson subsequently discussed blackout theory with Dr. Franks in Canada during January 1940. Dr. Benson talked again with Dr. Franks in March 1940, in New Orleans, Louisiana, at a meeting of the American Physiological Society. Dr. Benson subsequently became commanding officer of the Aero Medical Laboratory at Wright-Patterson Air Force Base, Dayton, Ohio, in September 1940. Dr. Benson testified that he probably saw Dr. Franks’ progress reports *522 after he arrived at the Aero Medical Laboratory in Dayton in September 1940. Dr. Benson testified further that Dr. Franks’ flying suit was demonstrated at Dayton in 1941 or early 1942. The evidence is insufficient to warrant findings as to just Which Franks’ suit construction became known to Dr. Benson during his contacts with Dr. Franks in January 1940 and again in March 1940.
42. Defendant’s witness, W. Kandolph Lovelace, an Air Force flight surgeon, succeeded Dr. Benson in 1943 as commanding officer of the Aero Medical Laboratory at Dayton. Dr. Lovelace accompanied Dr. Benson on the January 1940 visit to Dr. Franks in Canada. Dr. Lovelace testified that ha saw a flying suit worn by Dr. Franks at that time but that he did not recall seeing the actual bladders in said suit. Dr. Lovelace did recall that the Franks’ suit partially covered the legs, thighs and buttocks, but testified that the suit was not tested in aircraft during his visit. Dr. Lovelace also saw Dr. Franks in New Orleans in March 1940 at the meeting mentioned in finding 41. The evidence is insufficient to warrant findings as to just which Franks’ suit construction became known to Dr. Lovelace in January and March 1940.
43. Whether Dr. Franks’ experimental flying suit tested in Canada prior to the September 18, 1940 filing date of the Beall application for patent, actually embodied the specific constructions defined in the several Beall patent claims here in suit has not been proved. Whether Dr. Benson and/or Dr. Lovelace who visited Dr. Franks in Canada and in New Orleans prior to September 1940, actually acquired a knowledge from Dr. Franks of a suit or garment such as defined in the Beall patent claims has not been proved. Both knowledge and use of the belt construction shown in Poppen patent 2,104,758, issued January 11, 1938, existed in the United States prior to September 18,1940.
44. One Harry G. Armstrong, commanding officer of the Aero Medical Laboratory at Wright Field, Dayton, in 1939 and 1940, visited Dr. Franks in Canada in the summer of 1940. At that time Captain Armstrong was fitted with a suit having an inner lining filled with water under pressure for electrocardiographic pulse rate tests by Dr. Franks. Captain Armstrong did not testify herein. The evidence is *523 insufficient to warrant findings as to the details of any suit about which Captain Armstrong acquired knowledge in Canada in the summer of 1940, and as to whether the suit he was fitted with was a suit or garment of the construction defined in the several Beall patent claims here in suit.
45. John B. Poppen, mentioned in finding 37, had some knowledge in August 1940 that Dr. Franks was experimenting with flying suits in Canada. Dr. Poppen testified that he did not see a Franks’ flying suit until November 30,1940, a date subsequent to the filing date of the Beall patent here in suit. The evidence is insufficient to warrant findings as to just which Franks’ suit constructions became known to Dr. Poppen prior to his visit to Toronto in November 1940.
46. The testimony of Dr. John B. Poppen, Dr. Wilbur B. Franks, General Otis O. Benson, and Dr. W. Bandolph Lovelace shows that each had knowledge that Dr. Franks was engaged in developing and experimenting with flying suits in Canada prior to the filing date of the Beall patent application. The evidence is insufficient to warrant a finding that any particular Franks’ flying suit embodied each of the features specifically defined in the Beall patent claims in suit, or that a knowledge of such a specific flying suit was obtained by said witnesses or by Capt. Harry G. Armstrong prior to the Beall filing date. The development work done in Canada by Dr. Franks and those associated with him was still in the experimental stage at the time the Beall application for patent was filed.
47. Defendant has also contended that the Beall patent in suit is invalid for inoperativeness and for being misdescrip-tive, indefinite, and misleading. Defendant’s expert, Dr. Poppen, testified that pressure around the body is produced in the accused government flying suits by fluid pressure in sacks which exert tension on the garment, a tension around the circumference made uniform by virtue of expansion of the sack. Dr. Poppen also testified that the structure disclosed in figs. 1 and 3 of the Beall patent drawings embodies the same principle. Experimental flying suits utilizing said principle were produced under Beall’s direction by U.S. Bub-ber Company for the defendant’s Air Force during the fall of 1940 and later. The disclosure of the Beall patent was *524 not inoperative, misdescriptive, indefinite or misleading to one having ordinary skill in the art of blackout prevention in the late portion of the year 1940.
48. Plaintiff contends that the Beall patent claims in suit have been infringed by defendant’s flying suits including a coverall suit, plaintiff’s exhibit 8, a cutaway suit, plaintiff’s exhibit 9, the MC-4 suit with blackout-preventing bladders, plaintiff’s exhibit 10, and the MC-3 suit, plaintiff’s exhibit 11. Diagrammatic views of the cutaway suit and the MC-4 suit are reproduced at the end of this report.
49. The accused coverall suit snugly fits the legs and the abdominal region and has compartments for interconnected bladders which extend along the abdomen into the flanks and along a relatively narrow area of the legs as compared to the entire circumference. These fluid-containing bladders extend substantially the length of the body member to which they are adjacent so as to exert fluid pressure on a portion of the particular body member from top to bottom, as distinguished from encirclement of the member. In order to introduce fluid pressure into the bladders, an inlet hose is connected to the bladders in the abdominal region. In use, the inlet hose is connected to a pressure regulating valve connected to a source of fluid pressure in the aircraft. When maneuvers are performed which produce a certain amount of centrifugal force, the valve opens to the extent necessary to pressurize the bladders contained in the coverall suit. This pressure causes the bladders to press against the underlying portions of the body members and to tighten the garment fabric around the body to counteract the centrifugal force. When the centrifugal force and its effects are removed, the valve opens to permit the release of fluid pressure out the same inlet connection for discharge to the atmosphere. The valve provided has parts which define inlet and outlet passages. The coverall suit is provided with lacing means in order to adjust the suit to a snug fit to the wearer. After the lacing adjustment is made, the suit may be quickly opened or closed by means of slide fasteners.
50. The cutaway suit illustrated at the end of this report is generally similar to the coverall suit described above. In order to promote coolness of the wearer, sections in back of *525 the knees and above the legs are out away. The cutaway suit is constructed and operated essentially like the coverall suit.
51. The MC-4 suit consists of a snugly fitting adjustable coverall having external tubes called capstans running vertically along the limbs and portions of the body. When these tubes are inflated by fluid pressure, they react against tapes connecting the tubes to the garment to draw the garment tightly around the body and body members. The MC-4 suit also contains bladders similar to those contained in the coverall and the cutaway suits along the legs and abdomen to apply pressure to portions of said body members. An illustration of the MC-4 suit is reproduced at the end of this report.
52. The MC-3 suit is somewhat similar to the MC-4 suit but does not include blackout-prevention bladders within the suit. Both the MC-3 and the MC-4 suits are partial-pressure high-altitude flying suits used with helmets to provide aviators with protection against reduced barometric pressures at high altitude. The MC-4 suit includes the internal bladders to provide protection against blackout, but the MC-3 suit does not include this feature.
53. Claims 1-8 inclusive of the Beall patent read in terms on defendant’s coverall suit described in finding 49. Said claims also read in terms on defendant’s cutaway suit described in finding 50 and illustrated at the end of this report, and also in plaintiff’s exhibit 13A. Said claims also read in terms on defendant’s MC-4 suit described in finding 51 and illustrated at the end of this report and also in plaintiff’s exhibit 14. Claims 1-6 inclusive of the Beall patent do not read in terms on defendant’s MC-3 suit which has no sack compartments or pressure producing elements located inside the garment. Claims 7 and 8 of the Beall patent read in terms on defendant’s MC-3 suit by considering the external tubes or capstans thereof as relatively narrow longitudinally extending fluid tight pressure producing sack members.
54. Claims 1-8 inclusive of the Beall patent are found invalid as specifically set forth in findings 12, 23, and 29-35 inclusive, and invalid patent claims cannot be infringed. In the event that any claim of the Beall patent in suit should *526 be considered to be valid, then such patent claim has been infringed by the accused flying suits only to the extent indicated in finding 53.
55. The plaintiff filed formal claim for alleged infringement of his patent with the defendant and such claim was denied by letter from Office of Naval Research, Navy Department, dated April 17, 1947, and by letter from Office of the Judge Advocate General, Department of the Army, dated February 24,1948.
56. Summarizing, claims 1-8 inclusive of Beall patent 2.335.474 are found invalid because the subject matter of each claim was described in patents published more than 1 year prior to the filing date of the Beall application for letters patent.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 1 through 8, inclusive, of Beall patent 2.334.474 are invalid. Plaintiff is not entitled to recover and its petition is, therefore, dismissed.

*0